UNITED STATES of America

v.

BUSH, James and Rouse, Gene.

Appeal of Gene ROUSE.

Appeal of James BUSH.

UNITED STATES of America

v.

ONE 1978 OLDSMOBILE CUTLASS
VIN: 3M47F8M453413.

Appeal of Gene ROUSE and
Valine Rouse.

UNITED STATES of America

v.

$11,827.00 UNITED STATES
CURRENCY.

Appeal of Gene ROUSE.

Nos. 80–1116, 80–1168, 80–1751
and 80–1761.

United States Court of Appeals,
Third Circuit.

Argued Nov. 7, 1980.

Decided March 24, 1981.

Robert J. Cindrich, U. S. Atty., Sandra D. Jordan, Asst. U. S. Atty., Pittsburgh, Pa. (argued), for appellee.

Leonard I. Sharon, J. Roi Jones, Pittsburgh, Pa. (argued), for appellants.

Before ADAMS and SLOVITER, Circuit Judges and BROTMAN,* District Judge.

## OPINION OF THE COURT

BROTMAN, District Judge:

This is a consolidated appeal from two judgments of conviction and sentence and two final orders of forfeiture, entered by the United States District Court for the Western District of Pennsylvania. The appeal raises several Fourth Amendment questions of interest: whether there was probable cause for the issuance of a search warrant with respect to one of the appellants and the arrest of the other appellant, both of which actions were based primarily on information supplied by an unidentified informant; whether the forfeiture seizure of appellant's automobile, without a warrant and in the absence of exigent circumstances, satisfied the requirements of 21 U.S.C. § 881 and the Fourth Amendment; and whether the subsequent inventory search of that automobile exceeded permissible bounds?

I.

Of necessity, a rather detailed account of the facts underlying this appeal must precede any discussion of the legal issues that are in controversy. On July 23, 1979, Pittsburgh based agents of the Drug Enforcement Administration (DEA) obtained a warrant for the search of appellant Gene Rouse and any luggage or containers in his possession. The warrant was issued by a United States Magistrate based upon an affidavit sworn to by DEA agent Richard Sye, which recounted the following facts. At approximately 9:00 a. m. on July 23, 1979, agent Sye received a telephone call from an unidentified male informant (I–1), who advised the agent that two men were traveling from Pittsburgh to New York City that day to obtain between one-half pound and a pound of cocaine. The informant indicated that he would obtain more detailed information and call back. When asked why he was providing this information to the DEA, the informant stated that he had a "vendetta" going and wanted to see six or eight drug dealers incarcerated; the informant also inquired whether he could be rewarded for the information he was furnishing.

At approximately 1:15 p. m. on the same day, the informant again telephoned the

---

* Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey, sitting by designation.

DEA. He advised agent Sye that one of the two persons traveling to New York was Gene Rouse and that they had flown to New York that morning and would be returning to Pittsburgh that evening. When asked whether the Gene Rouse was associated with Gene & Les' Bar, the informant responded "you know of him then." Agent Sye then asked the informant to name the other person who was traveling with Rouse, at which point the informant stated he would call back with that information. A few minutes later the informant called the agent and advised him that the other person was named Jim Bush and that he believed the two men had traveled to the airport in Rouse's black Oldsmobile.

The agent then attempted to verify the information he had received from the informant. He learned from the TWA floor supervisor at the Pittsburgh airport that a party of two, using the names J. Bush and G. Bush, had booked passage on TWA flight number 422, which had departed Pittsburgh that morning for LaGuardia airport in New York. The TWA supervisor also indicated that the Bush party had booked a rental car in New York and that they had return reservations for TWA flight number 219, scheduled to leave LaGuardia at 7:45 p. m. that evening and to arrive in Pittsburgh at 9:02 p.m. The airline tickets had been purchased with a TWA credit card issued to James Bush. The DEA agent also learned that the party had left a call-back telephone number of 243–5943. A Pennsylvania Bell security officer told the agent that the number was a non-published one listed to a James T. Bush of Pittsburgh.

Subsequently, the agent contacted the Commonwealth Department of Motor Vehicles and learned that a 1978 Oldsmobile coupe, bearing Pennsylvania license number OK9–611, was registered to Gene Rouse of Pittsburgh. He was also informed that there was neither a driver's license nor a vehicle registration in the name of James T. Bush. Later that afternoon, another DEA agent observed a black Oldsmobile, with Pennsylvania license number OK9–611, parked near an entrance to the TWA terminal at the Pittsburgh airport.

Through a Pittsburgh police detective who was working with him, Agent Sye then contacted a second informant (I–2), one who had previously made eight controlled buys from known drug traffickers. I–2 stated that he had purchased cocaine from Gene Rouse on numerous occasions during the preceding years, and indicated that during the preceding week he had purchased approximately one gram of cocaine from Rouse at Gene & Les' Bar. I–2 also stated that he was aware that Jim Bush was associated with Rouse. The informant further advised that he had gone to Gene & Les' Bar that day, where he was told by an employee of the bar that Gene Rouse was out of town but was expected to return that evening. Finally, I–2 provided a thorough description of Rouse's appearance. The affidavit contained the additional fact that Agent Sye had reviewed DEA records, which revealed that Gene Rouse had been listed with the agency since 1971 as a suspected cocaine trafficker.

Based on the above information, the Magistrate issued a warrant for the search of Rouse and of any luggage in his possession, but refused to issue a search warrant with respect to Bush because of the unavailability of a description of him. She indicated, however, that in her opinion the affidavit provided probable cause for the arrest of Bush. Invested with the warrant, DEA agents then proceeded to the Pittsburgh airport. One of the agents called the DEA office at LaGuardia airport and asked the New York agents to conduct a surveillance. Somewhat later the New York agents reported that they had observed Rouse and Bush in the boarding area for the Pittsburgh flight, and provided a thorough description of the two men, including the fact that Bush walked with a noticeable limp. They stated that Bush was carrying a white shopping bag and a brown leather attache case, that at one point Bush went to the lavatory, at which time he handed the attache case to Rouse, and that the two men boarded the plane together and were assigned adjacent seats.

Prior to the flight's arrival in Pittsburgh, the DEA agents staked out positions so that they could observe Rouse and Bush as the latter came off the plane. The two men left the plane together, with Rouse now carrying the briefcase, walking in the direction of Rouse's car, but slowly separating until Rouse was approximately sixty feet in front of Bush. The DEA agents stopped Rouse when he was approximately twenty yards from his car. Almost simultaneously, Bush changed direction and walked away from where Rouse was being detained. Other agents then stopped Bush and arrested him. Both men were taken to the Allegheny County police office, located at the airport, where they were searched. The brown attache case in Rouse's possession was also searched.

The search revealed that Bush had an "Ace" bandage wrapped around his knee. Under the bandage were approximately 100 grams of cocaine. Bush also had three dollars in cash and a TWA credit card on his person. Rouse had $127.00 in cash and the keys to his car on his person. A search of the attache case revealed $11,700.00 in cash.

On the following morning, DEA agents seized Rouse's car, which was still in the airport parking lot. An inventory search of the car was subsequently conducted, which revealed various narcotics paraphernalia in a partially covered but unsealed cardboard box found in the trunk of the car.

Prior to trial, the District Court conducted a suppression hearing. The court found that agent Sye's affidavit established probable cause and that the search warrant had therefore been properly issued. In addition, the court upheld the warrantless arrest of Bush and the search conducted incident to that arrest.[1] The trial court later upheld the seizure of Rouse's car and the introduction into evidence of the items found in the trunk of the car.

Following a jury trial, appellants were each convicted on two counts of the Indict-ment.[2] The court later imposed sentences, from which judgments Rouse and Bush now appeal.

On December 26, 1979, the Government filed a civil complaint seeking the forfeiture of Rouse's automobile and the currency found in the attache case, pursuant to 21 U.S.C. § 881. A non-jury trial was held on April 30, 1980, at the conclusion of which the District Court ordered the automobile and the currency forfeited to the United States. Rouse appeals from the final order of the forfeiture.

We conclude that the affidavit submitted to the Magistrate established probable cause for the issuance of the search warrant; that the arrest of Bush was supported by probable cause, and that the subsequent search of Bush was a legitimate search incident to arrest; that the seizure of Rouse's car comported with the requirements of 21 U.S.C. § 881 and of the Fourth Amendment; and that the inventory search of that automobile was consistent with Fourth Amendment standards. Accordingly, the judgments of the District Court will be affirmed.

II.

Appellants argue that the search of Rouse and the arrest of Bush did not comply with the Fourth Amendment requirement of probable cause. Relying primarily on *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), appellants contend that I–1's tip was necessary for a finding that there was probable cause for the search and the arrest, and that the tip fails to satisfy the two-pronged test established in *Aguilar* for determining whether an informant's tip demonstrates probable cause. To resolve the question whether the probable cause standard was met here, we must closely examine the *Spinelli* Court's elucidation of

---

1. The District Court did suppress certain statements made by appellants. That ruling is not at issue on this appeal.

2. 21 U.S.C. §§ 841(a)(1), 846 (possession of a controlled substance with intent to distribute and conspiracy to possess a controlled substance).

the *Aguilar* test. In doing so, we follow the analytical course charted by this court's decision in *McNally v. United States*, 473 F.2d 934 (1973).

### A.

■ Initially, we shall consider whether the Magistrate properly issued a warrant for the search of Rouse and his luggage. The starting point for our inquiry is the Fourth Amendment,[3] which requires that warrants only be issued upon a showing of probable cause. Perhaps the most basic principle of the cases interpreting this requirement is that the decision whether probable cause exists should be made by a "neutral and detached magistrate," not by those "engaged in the often competitive business of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). *See Whiteley v. Warden*, 401 U.S. 560, 564, 91 S.Ct. 1031, 1034, 28 L.Ed.2d 306 (1971). To ensure that it is the magistrate who decides whether probable cause exists, an affidavit must contain the factual basis for the finding of probable cause, not merely "the unsupported assertion or belief of the officer." *Spinelli, supra*, 393 U.S. at 423–24, 89 S.Ct. at 592–93 (White, J., concurring); *Nathanson v. United States*, 290 U.S. 41, 47, 54 S.Ct. 11, 13, 78 L.Ed. 159 (1933).

In *Aguilar*, the Court held that probable cause may be established on the basis of hearsay—for example, by an affidavit of a law enforcement officer that relies entirely on an informant's tip. 378 U.S. at 114, 84 S.Ct. at 1513. However, to ensure that it is the magistrate, not the informant or the officer, who decides whether probable cause exists, the *Aguilar* Court held that such a hearsay affidavit must meet a two-pronged test. First, the affidavit must contain facts sufficient to support the finding that the informant based his conclusions on adequate knowledge. Secondly, the affidavit must recite facts, not mere conclusory assertions of the officer, which demonstrate

the credibility of the informant. The magistrate may base probable cause for a warrant exclusively on an informant's tip only when facts demonstrating both the informant's basis of knowledge and his credibility are specified in the officer's affidavit. *Spinelli, supra*, 393 U.S. at 413, 89 S.Ct. at 587.

It is clear that without I–1's tip the affidavit would not demonstrate probable cause. Thus, we must measure the tip against the *Aguilar* standards. *See McNally, supra*, 473 F.2d at 938. On the surface, at least, I–1's tip fails both prongs of the *Aguilar* test. There is no explicit indication in the affidavit with respect to the informant's basis of knowledge; nor is there any explicit indication of the informant's veracity. However, *Spinelli* teaches that each of the prongs of the *Aguilar* test may be satisfied indirectly. 393 U.S. at 415–17, 89 S.Ct. at 588–89. *See McNally, supra*, 473 F.2d at 938. Thus, we proceed to consider whether the affidavit contained sufficient indirect evidence of the informant's basis of knowledge and his veracity. In order not to dilute the probable cause standard, we must ask if "the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?" *Spinelli, supra*, 393 U.S. at 415, 89 S.Ct. at 588.

■ Initially, we shall consider whether the affidavit sufficiently establishes the veracity of the informant. We note that I–1 was totally without a track record, the typical basis for a finding of veracity. *See* W. LaFave, 1 Search & Seizure § 3.3(b) (1978). Indeed, he never even identified himself to the DEA agents. However, the absence of a history of accurate tips does not necessarily negate an informant's veracity. In *Aguilar*, itself, the Court stated that the veracity prong could be established by showing either that the informant was credible *or* that his information was reliable. 378 U.S. at

---

**3.** The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S.Const. amend. IV.

108, 84 S.Ct. at 1509. *See Spinelli, supra,* 393 U.S. at 426–27, 89 S.Ct. at 594–95 (White, J., concurring). Hence, numerous courts have held that adequate corroboration of some of the elements of a tip can satisfy the veracity prong of *Aguilar.*[4] The theory underlying this approach is both simple and sound. Independent police corroboration reinforces the informant's veracity because it shows that he is not merely reporting a "madeup story," *id.* at 426, 89 S.Ct. at 594, or "fabricating his report out of whole cloth." *Id.* at 417, 89 S.Ct. at 589 (majority opinion).

■ It is difficult to define with precision the quantity of corroboration necessary to demonstrate the informant's veracity. Certainly, more than the corroboration of a few minor elements of the story is necessary, especially if those elements involve non-suspect behavior. It is equally certain, though, that the police need not corroborate every detail of an informant's report to establish sufficient evidence of his veracity. *See* LaFave, *supra,* § 3.3(f) at pp. 556–61. In the instant matter the DEA agents corroborated numerous elements of I–1's tip, including the following facts: (1) Rouse was out of town; (2) Bush was Rouse's associate; (3) Bush had purchased two round trip airfares to New York; and (4) Rouse's car was parked near the TWA terminal at the Pittsburgh airport. In addition, the information from I–2 corroborated the fact that Rouse was a cocaine trafficker. Taken together, the corroborated facts demonstrated that I–1 was not merely spinning a yarn. These facts clearly satisfied the veracity prong of the *Aguilar* test.

■ A more difficult question is presented with respect to the basis of knowledge prong of *Aguilar.* Arguably, this is the more critical element of the test; for if it is truly to be the magistrate who makes the probable cause determination, he must be made aware of the factual predicate of an informant's allegations. Otherwise, warrants will regularly be issued based on no more than underworld rumor or the gossip overheard in corner taprooms. In the instant matter, of course, the basis of I–1's knowledge was not revealed in the affidavit. However, this defect is not necessarily fatal. Hence, we proceed to inquire whether anything in the tip or affidavit provided sufficient grounds for the magistrate to conclude that the informant's basis of knowledge was in fact legitimate.

■ In *Spinelli* the Court held that sufficient detail in a tip can support the inference that the informant's basis of knowledge was legitimate. As justice Harlan explained:

In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.

393 U.S. at 416, 89 S.Ct. at 589. The *Spinelli* Court looked to *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), and found in that decision a "suitable benchmark" with respect to the amount and type of detail necessary to satisfy the *Aguilar* test. *Id.* 393 U.S. at 416–17, 89 S.Ct. at 589–90. The Court noted that the tip in *Draper* was extremely detailed, including a description with "minute particularity" of the clothes the suspect would be wearing. The Court concluded: "A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way." *Id.* at 417, 89 S.Ct. at 590. Because the details related in *Draper* were of a kind known only to those intimately involved in the scheme, the magistrate (or officer in that case) could reasonably infer

---

4.  *See, e. g., United States v. Polus,* 516 F.2d 1290 (1st Cir.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127 (1975); *United States v. Carter,* 498 F.2d 83 (D.C.Cir.1974); *United*

*States v. Manning,* 448 F.2d 992 (2d Cir.), *cert. denied,* 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971). *See generally* LaFave, *supra,* at § 3.3(f).

that the informant's basis of knowledge was legitimate.[5]

We need not, at this time, define the precise standard that should be used in determining whether a given tip contains adequate detail to infer direct knowledge on the part of the informant. That standard, however, must be a stringent one, for only by adhering to the essential demands of the *Aguilar* test can we avoid eviscerating the Fourth Amendment requirement of probable cause. It is sufficient to note that, at a minimum, the details must be such as will allow the magistrate to conclude with confidence that the informant's basis of knowledge was legitimate.[6]

When measured against this standard, the details in I-1's tip are plainly inadequate. The relevant details in the tip were that two men—Gene Rouse and Jim Bush—had flown to New York that morning to obtain between one-half pound and a pound of cocaine. The informant also indi-

cated that the two men would be returning to Pittsburgh that evening. In addition, he stated that he thought the two men had driven to the airport in Rouse's black Oldsmobile. These facts, unlike those present in *Draper*, do not demonstrate that the informant came upon his knowledge through direct observation or an equally reliable means. *See, Spinelli, supra*, 393 U.S. at 428, 89 S.Ct. at 595 (White, J., concurring). It is surely equally probable that the informant was merely repeating a rumor overheard on the street, not reporting facts he knew of directly. This conclusion is strengthened by the fact that the informant was uncertain whether Rouse had driven his black Oldsmobile to the airport. This fact is the only one reported that arguably would only be known to someone with reliable information. The informant's uncertainty with respect to it betrays the fact that he obtained at least this one bit of information in a questionable manner.[7]

---

5. A legitimate basis of knowledge means, in general, that the informant either directly observed the critical facts or that he obtained those facts directly from one of the participants in the criminal enterprise, who, by revealing those facts, made an admission against penal interest. *See United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); LaFave, *supra*, § 3.3(e).

6. Professor LaFave has suggested that the self-verifying details approach only be used "when the details indicate quite clearly that the informant's basis of knowledge *must* have been sufficient." LaFave, *supra* § 3.3 at p. 546 (emphasis in original). This may be too exacting a standard. Certainly, it is necessary to ensure the legitimacy of the information underlying the magistrate's determination of probable cause. However, we must bear in mind that "the issue in warrant proceedings is not guilt beyond a reasonable doubt but probable cause for believing the occurrence of a crime." *United States v. Harris*, 403 U.S. 573, 584, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971) (Opinion of Burger, C.J.). .*See United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965). Arguably, the self-verifying details approach may appropriately be used when the details in the tip clearly and convincingly lead to the conclusion that the informant had a legitimate basis of knowledge with respect to the critical facts alleged. *See Arkansas v. Sanders*, 442 U.S. 753, 761, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979); *Spinelli, supra*, 393 U.S. at 415, 89 S.Ct. at 588.

7. In addition, appellants make much of the fact that the informant contacted the DEA on three occasions, each time giving a few additional details. Indeed, during their second conversation, the DEA agent asked the informant to name the person accompanying Rouse, to which the informant replied that he would call back in a few minutes with that information. Appellants observe that this sequence of telephone calls indicates that the informant did not have direct knowledge of the facts he reported; rather, the logical inference is that he gleaned those facts from some third party. Appellants argue that this is further evidence that the tip did not comport with the *Aguilar* standards.

In a more typical case, there would be considerable force to that argument. It does, indeed, seem that the informant was obtaining information from some third person, which he then communicated to the agent. If the veracity prong of *Aguilar* had been satisfied in the classical manner—by means of this informant's history of accurate tips—then the apparent involvement of a third person would have created serious problems. For it is essential that both prongs of *Aguilar* be satisfied with respect to the same informant; only when evidence of both veracity and a basis of knowledge coincide in one individual is the test satisfied. *See, e. g., United States v. Spach*, 518 F.2d 866 (7th Cir. 1975); *United States v. Smith*, 462 F.2d 456 (8th Cir. 1972). *See also McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). Thus, the situation hypothesized—where reliability is established with respect to

We recognize, of course, that the DEA agents corroborated the fact that Rouse's black Oldsmobile was parked at the airport. The corroboration of this fact, however, while it reinforces the informant's credibility, is not probative with respect to whether the informant had an adequate basis of knowledge.[8] As Justice White explained in his thoughtful concurrence in *Spinelli*, corroboration merely "relates to the reliability of the source: because an informant is right about some things, he is more probably right about other facts, usually the critical unverified facts." 393 U.S. at 427, 89 S.Ct. at 594. But corroboration of nine facts tells one nothing at all about an informant's basis for knowing a tenth independent fact. *Id.* It is detail, not corroboration, which allows one to infer a legitimate basis of knowledge. That detail, as we noted above, is lacking in the instant case. Thus, the affidavit does not adequately establish I–1's basis of knowledge. Because it satisfied only one element of the *Aguilar* test, I–1's tip was not a sufficient basis for a finding of probable cause.

Although I–1's tip was insufficient, without more, to establish probable cause, the tip could be considered, in conjunction with other evidence, as one factor in the probable cause equation. *See Spinelli, supra*, 393 U.S. at 418, 89 S.Ct. at 590; *McNally, supra*, 473 F.2d at 939. Hence, we must consider whether the tip, when looked at together with the other information in the affidavit, was sufficient to establish probable cause.

We find that the affidavit presented to the Magistrate established probable cause for the issuance of the search warrant. In making this determination, we limit our scrutiny to "independently suspect activity" described in the affidavit.[9] *Id.* Obviously, the most relevant factor in this regard was the information provided by I–2, who stated that he had purchased cocaine from Rouse on a number of occasions, most recently within the preceding week. Standing alone, I–2's tip would not have provided probable cause for issuance of the search warrant. However, when viewed in conjunction with I–1's tip, the information gleaned from I–2 was sufficient to establish probable cause. Accordingly, we hold that the warrant was properly issued.

### B.

Secondly, we must consider whether the arrest and subsequent search of Bush satisfied Fourth Amendment requirements. When the DEA agents appeared before the Magistrate, she indicated that there was probable cause for the arrest

---

an informant who has no direct knowledge himself, but who has gathered the critical facts from a confidant—does not comport with the *Aguilar* standard. For, in such a situation, the two prongs of the test, though each may be sufficiently established, do not adequately reinforce each other.

The situation appellants hypothesize, however, is not this case. Here, the evidence of veracity is not the track record of I–1, but rather the independent corroboration by the DEA agents of a substantial number of the facts reported. Where the veracity prong is satisfied solely on the basis of police corroboration, it is irrelevant whether it was I–1 or some confidant of his who observed the critical facts. It is, of course, necessary that the magistrate be able to conclude that *someone* had a legitimate basis of knowledge with respect to the critical facts. But where, as here, veracity is established by police corroboration, the identity of the person who has direct knowledge of the facts is irrelevant. *See, e. g., United States v. Fluker*, 543 F.2d 709 (9th Cir. 1976); *United*

*States v. Carmichael*, 489 F.2d 979 (7th Cir. 1972).

**8.** *See, e. g., United States v. Montgomery*, 554 F.2d 754 (5th Cir. 1977); *United States v. Hamilton*, 490 F.2d 598 (9th Cir.), *cert. denied*, 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974); *United States v. Myers*, 538 F.2d 424, 427 (D.C. Cir.1976) (Leventhal, J., dissenting); *Stanley v. State*, 19 Md.App. 507, 313 A.2d 847. *See generally* LaFave, *supra*, at § 3.3(f); Comment, *Adequacy of Informant's Tip as Basis for Probable Cause is Questioned*, 45 N.Y.U. L.Rev. 908, 915–16 (1970).

**9.** We do not accord significant weight to the fact that Rouse was listed on DEA records as a suspected drug trafficker. It would demean the Fourth Amendment intolerably to lower the standard of probable cause merely because the police have labelled someone a suspect. *See McNally, supra*, 473 F.2d at 938.

of Bush. She did not issue a warrant, however, because there was no description of Bush available. Subsequently, the agents did in fact arrest Bush, and then conducted a search incident to that arrest. It is now clear that an arrest may be made in a public place without a warrant. *See Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1977). It is also well established that the authorities may conduct a search incident to an arrest without securing a warrant for that limited search. *See United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Thus, the only question we must resolve is whether the arrest of Bush was consistent with the Fourth Amendment requirement of probable cause. We find that it was.

■ This finding is to a considerable extent implicit in our earlier discussion. We have determined that there was probable cause to believe that Rouse had traveled to New York to purchase cocaine. Thus, if there was sufficient reason to believe that Bush was involved in Rouse's illegal activity, the probable cause standard would be satisfied with respect to Bush. I–1's tip, given its inherent deficiencies, was not sufficient, standing alone, to connect Bush to the illegal activities. However, the DEA agents determined that Bush had purchased two round-trip fares to New York, booking them under the names J. Bush and G. Bush. In addition, the agents learned that Bush had arranged to rent a car upon his arrival in New York, despite the fact that he was not a licensed driver. These facts, when viewed in conjunction with the other infor-

mation previously discussed and the agents' awareness that drug couriers frequently work in pairs, justified the conclusion that Bush was probably involved in Rouse's scheme. *See United States v. Afanador*, 567 F.2d 1325 (5th Cir. 1978). Any residual doubt with respect to Bush's involvement with Rouse was amply dissipated by the agents' observation of the suspects at LaGuardia airport and subsequently at the Pittsburgh airport. Thus, we hold that there was probable cause for the arrest of Bush; the subsequent search of his person, incident to the arrest, was therefore valid, and the evidence resulting from that search was properly admitted.[10]

### III.

The second issue raised by Rouse concerns the warrantless seizure of his automobile on the morning of July 24, 1979, the day after his arrest. Rouse correctly observes that there were no exigent circumstances justifying the seizure, and he argues that the seizure of the automobile was therefore violative of statutory and constitutional standards. We must determine, then, whether the warrantless seizure of the car was authorized by 21 U.S.C. § 881(b); and, because we find that the seizure was authorized by the statute, we must consider whether that statute is consistent with Fourth Amendment standards.

### A.

■ Rouse's automobile was seized pursuant to the forfeiture provisions of 21 U.S.C. § 881, which provide, *inter alia*, for the forfeiture to the government of vehicles used or intended to be used to facilitate the distribution of controlled substances.[11]

---

**10.** Given our disposition of this issue, we need not reach the question whether appellant Rouse has "standing" to contest the arrest and search of Bush. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

**11.** The pertinent parts of the statute provide as follows:

> (a) *The following shall be subject to forfeiture to the United States and no property right shall exist in them:*
>
> (1) All controlled substances which have been manufactured, distributed, dispensed, or acquired in violation of this subchapter.
>
> (2) All raw materials, products, and equipment of any kind which are used, or intended for use, in manufacturing, compounding, processing, delivering, importing, or exporting

Subsection (b)(4) of the statute provides that the Attorney General may seize property subject to forfeiture without process when there is "probable cause to believe that the property has been used or is intended to be used in violation of this subchapter." In light of the facts discussed above, there is no doubt of the existence of probable cause to believe that Rouse's car had been used or was intended for use to "facilitate the transportation . . . [or] possession . . . of a controlled substance." *See, e. g., United States v. One 1976 Lincoln Continental Mark IV*, 584 F.2d 266 (8th Cir. 1978) (per curiam); *United States v. One 1974 Cadillac Eldorado Sedan*, 548 F.2d 421 (2d Cir. 1977); *United States v. One Clipper Bow Ketch Nisku*, 548 F.2d 8 (1st Cir. 1977). On its face, then, subsection (b)(4) would appear to have authorized the warrantless seizure of the automobile, notwithstanding the absence of any exigency. We see no reason to depart from a literal reading of the statute.

We are cognizant that at least one court of appeals has interpreted subsection (b)(4) narrowly. In *United States v. Pappas*, 613 F.2d 324 (1st Cir. 1980) (en banc), the first circuit held that the probable cause exception justifies the warrantless seizure of an automobile "only when the seizure immedi-

ately follows the occurrence that gives the federal agents probable cause to believe that the automobile is subject to forfeiture under section 881(a) *and* the exigencies of the surrounding circumstances make the requirement of obtaining process unreasonable or unnecessary." *Id.* at 330 (emphasis in original). *See also O'Reilly v. United States*, 486 F.2d 208, 214 (8th Cir.) (Lay, J., dissenting), *cert. denied*, 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973).[12] The *Pappas* court reasoned that a literal reading of the (b)(4) exception would, in effect, swallow up the general rule that property subject to forfeiture shall be seized "upon process issued." The court felt that "to adhere to the literal language of the (b)(4) exception . . . would render essentially meaningless the basic provision it purports to qualify." 613 F.2d at 329. In order to avoid this seeming inconsistency in the statute, the *Pappas* court read into subsection (b)(4) the requirements of temporal immediacy and exigent circumstances as prerequisites to a warrantless seizure. *Id.* at 330.

We choose, however, to give the statute a more straightforward interpretation. Several reasons lead us to this result. We start, as we must, with the language of the statute,[13] which, on its face, is of plain

---

any controlled substance in violation of this subchapter.

(3) All property which is used, or intended for use, as a container for property described in paragraph (1) or (2).

(4) *All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) or (2).*

(b) *Any property subject to forfeiture to the United States under this subchapter may be seized by the Attorney General upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims by any district court of the United States having jurisdiction over the property, except that seizure without such process may be made when —*

(4) *the Attorney General has probable cause to believe that the property has been used or is intended to be used in violation of this subchapter.*

In the event of seizure pursuant to paragraph (3) or (4) of this subsection, proceedings under

subsection (d) of this section shall be instituted promptly.

21 U.S.C. § 881 (1976) (emphasis added).

**12.** A number of courts have been able to avoid the question of subsection (b)(4)'s meaning and validity, finding in the facts before them an independently recognized exception to the warrant requirement. *See United States v. One 1972 Chevrolet Nova*, 560 F.2d 464, 469–70 (1st Cir. 1977); *United States v. Capra*, 501 F.2d 267, 280 (2d Cir. 1974); *United States v. Thrower*, 442 F.Supp. 272, 278–79 (E.D.Pa.), aff'd mem., 568 F.2d 771 (3d Cir. 1977). Given the instant facts, in particular the trial judge's express finding that there were no exigent circumstances justifying the seizure, we cannot take this route, but must squarely confront the question of subsection (b)(4)'s appropriate reach.

**13.** " 'The starting point in every case involving the construction of a statute is the language itself.' " *International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*, 439 U.S. 551, 558, 99 S.Ct.

meaning. Subsection (b)(4) explicitly provides that "seizure without such process may be made when ... the Attorney General has probable cause to believe that the property has been used or is intended to be used in violation of this subchapter." In interpreting this language, we must be "mindful that the language of a statute controls when sufficiently clear in its context." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). As the Supreme Court has recently observed, "[i]n the absence of a conflict between reasonably plain meaning and legislative history, the words of the statute must prevail." *Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 700, 100 S.Ct. 1945, 1957, 64 L.Ed.2d 611 (1980). There is no such conflict between the plain meaning of § 881 and the legislative history of the statute. Section 881(b) was enacted as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, one of the aims of which was to "strengthen existing law enforcement authority in the field of drug abuse." House Report No. 1444, 91st Cong., 2d Sess. 1 (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 4566, 4566. *See Pappas, supra*, 613 F.2d at 332 (Campbell, J., concurring). The drafters of the 1970 Act clearly intended to liberalize, not restrict, the existing authority of law enforcement officers to seize property used in contravention of the drug control laws. Thus, to read an exigent circumstances requirement into the statute would be consistent with neither the plain language nor the legislative history of the Act.

■ Moreover, as Judge Campbell has persuasively demonstrated, giving the statute its plain meaning does not lead to inconsistencies within the Act. *Id.* at 333. The general rule enunciated in § 881(b) allows a seizure "upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims." The admiralty rules authorize the clerk to issue a warrant for the arrest of a vessel upon the filing of a complaint. Supplemental Rule C(3). No probable cause showing is necessary for such a seizure.[14] Subsection (b)(4), on the other hand, if given a plain reading, would allow a warrantless seizure of property subject to forfeiture, but only if there was probable cause to believe that the property was being used in violation of the Act. Thus, a straightforward reading of the statute, far from rendering it internally inconsistent, leads to a natural congruence of the various provisions. Therefore, we hold that the warrantless seizure of Rouse's car was consistent with the standards of 21 U.S.C. § 881(b)(4), notwithstanding the absence of any exigent circumstances. *United States v. One 1977 Lincoln Mark V Coupe*, 643 F.2d 154 (3d Cir. 1981).

### B.

Having concluded that the warrantless seizure was authorized by statute, we must now consider whether that seizure was consistent with the requirements of the Fourth Amendment. We find that it was.

Initially, we note that a majority of the courts of appeals that have considered the issue have held that a warrantless seizure of forfeit property is constitutional, notwithstanding the absence of exigent circumstances.[15] Indeed, this court has previ-

---

790, 795, 58 L.Ed.2d 808 (1979), *quoting Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring).

**14.** This case does not raise the question whether the issuance of a warrant, pursuant to the Admiralty Rule, on less basis than probable cause would be consistent with the Fourth Amendment's requirement that "no Warrants shall issue, but upon probable cause." Accordingly, we take no position with respect to that question. *Cf. United States v. Articles of Hazardous Substance*, 588 F.2d 39, 43 (4th Cir.

1978) ("the Commission's adherence to the Admiralty Rules provided sufficient probable cause for the issuance of the warrant of seizure in this case.")

**15.** *See United States v. One 1975 Pontiac LeMans*, 621 F.2d 444, 450 (1st Cir. 1980); *United States v. Milham*, 590 F.2d 717, 720 (8th Cir. 1979); *United States v. LaVecchia*, 513 F.2d 1210, 1215 (2d Cir. 1975); *United States v. White*, 488 F.2d 563, 564–65 (6th Cir. 1973); *United States v. Stout*, 434 F.2d 1264 (10th Cir. 1970). *See also Founding Church of Scientology v. United States*, 409 F.2d 1146, 1150 (D.C.

ously held that law enforcement officers may seize a vehicle without a warrant if they have probable cause to believe that the vehicle is subject to forfeiture. *United States v. Troiano*, 365 F.2d 416, 418–19 (3d Cir.), *cert. denied*, 385 U.S. 958, 87 S.Ct. 396, 17 L.Ed.2d 303 (1966). Recent developments in Fourth Amendment doctrine confirm the continued validity of our holding in *Troiano* and the appropriateness of extending that holding to the facts of this case.

Those doctrinal developments follow two somewhat distinct tacks. First, in demarcating the requirements imposed by the Fourth Amendment, the Supreme Court has increasingly focused in recent years on the question whether governmental action intruded on the defendant's "legitimate expectation of privacy." *Rakas v. Illinois*, 439 U.S. 128, 143, 143 n.12, 99 S.Ct. 421, 430, 430 n.12, 58 L.Ed.2d 387 (1978).[16] One critical factor in that regard is whether government agents intruded onto private property. Thus, in rejecting a Fourth Amendment challenge to the warrantless seizure by Internal Revenue Service officers of automobiles parked in public places, the Court recently commented: "The seizures of the automobiles in this case took place on public streets, parking lots, or other open places, and did not involve any invasion of privacy". *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 351, 97 S.Ct. 619, 627, 50

L.Ed.2d 530 (1977); *see id.* at 354, 97 S.Ct. at 629. This theme was reiterated this past term in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), where the Court noted that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Id.* 100 S.Ct. at 1380. In the instant case, the seizure of Rouse's car took place in a public parking lot at the Pittsburgh airport. Thus, *G. M. Leasing* and *Payton* provide considerable support for the conclusion that the warrantless seizure of Rouse's car was consistent with constitutional requirements.

The second relevant doctrinal development is the growing recognition of the distinction, for purposes of Fourth Amendment analysis, between searches and seizures.[17] A literal reading of the Fourth Amendment does not reveal this distinction. However, notwithstanding the apparent identity of the standard for search with that for seizure, it is now clear that the test of reasonableness for a search is, in at least certain situations, more stringent than the test of reasonableness for a seizure, for a seizure may be made without a warrant in circumstances where a search could not lawfully be made without one.[18]

We shall not attempt the bootless task of elucidating the logic of a situation

---

Cir.), *cert. denied*, 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969). *But see United States v. Pruett*, 551 F.2d 1365, 1369–70 (5th Cir. 1977); *United States v. McCormick*, 502 F.2d 281, 287 (9th Cir. 1974).

In *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), the Court held that due process does not require notice and a hearing before government agents seize property pursuant to a forfeiture statute. *See generally*, Kandaras, *Due Process and Federal Property Forfeiture Statutes: The Need for Immediate Post-Seizure Hearing*, 34 Sw.L.J. 925 (1980). The *Calero-Toledo* Court refused to address the "question whether the Fourth Amendment warrant or probable cause requirements are applicable to [forfeiture] seizures." 416 U.S. at 679–80, n.14, 94 S.Ct. at 2089–90, n.14.

16. *See, e. g., Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83,

90, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980); *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980).

17. *See Walter v. United States*, 447 U.S. 649, 654, 100 S.Ct. 2395, 2400, 65 L.Ed.2d 410 (1980) (Opinion of Stevens, J.) (it is "settled that an officer's authority to possess a package is distinct from his authority to examine its contents"). *See also Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

18. Of course, we imply no diminution in the standard of probable cause for seizures. *See United States v. Shaefer*, 637 F.2d 200 (3d Cir. 1980). *But cf. United States v. Johnson*, 572 F.2d 227, 234 (9th Cir. 1978) ("The standard of probable cause to support a seizure for forfeiture is less precise and rigorous than that required to obtain a search warrant in ordinary circumstances").

that defies logic.[19] Rather, we are content to note the presence in the instant situation of the factors the Court, in *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), found relevant in holding that arrests outside the home may be made without a warrant. *See Payton, supra*, 100 S.Ct. at 1382. Perhaps the most important factor is the explicit Congressional authorization of warrantless seizures in the statute. As the Court noted in *Watson*, such Congressional judgments with regard to what is reasonable should be accorded a " 'strong presumption of constitutionality.' " 423 U.S. at 416, 96 S.Ct. at 824, *quoting United States v. Di Re*, 332 U.S. 581, 585, 68 S.Ct. 222, 224, 92 L.Ed. 210 (1948). A second factor is the general acceptance of the reasonableness of warrantless forfeiture seizures, evidenced by the decisions of a clear majority of the courts of appeals that have considered the issue. A third relevant factor is the historical acceptance of the constitutionality of warrantless forfeiture seizures. *See, e. g., Dobbin's Distillery v. United States*, 96 U.S. 395, 396, 24 L.Ed. 637 (1878); *Boyd v. United States*, 116 U.S. 616, 623–24, 6 S.Ct. 524, 528–29, 29 L.Ed. 746 (1886); *United States v. Francolino*, 367 F.2d 1013, 1018–20 (2d Cir. 1966), *cert. denied*, 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967). Finally, we note again the Supreme Court's recognition in *Watson* of the constitutionality of warrantless arrests, supported by probable cause, which are effected in public places. 423 U.S. at 423–24, 96 S.Ct. at 827–28. Because an arrest involves a significantly greater intrusion on Fourth Amendment interests than

the seizure of an unoccupied automobile, we conclude that the warrantless seizure of Rouse's car was consistent with Fourth Amendment standards. *See Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640–2641, 61 L.Ed.2d 357 (1979).[20]

### IV.

Subsequent to the seizure of Rouse's car, DEA agents conducted a warrantless inventory search of the vehicle. In the trunk they discovered an unsecured cardboard box, the lid of which was partially ajar exposing some of the contents. The agents examined the contents of the box and discovered various narcotics paraphernalia. Rouse now challenges the introduction into evidence of the contents of the box.

■ It is well established that law enforcement officers may make a warrantless inventory search of a legitimately seized vehicle. *See South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). Thus, the sole question we must resolve is whether the scope of the search in the instant case exceeded permissible bounds. Relying on *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), Rouse contends that the agents should have inventoried the box as a whole and not

19. As Justice Powell observed in his thoughtful concurrence in *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), "[s]ince the Fourth Amendment speaks equally to both searches and seizures, and since an arrest, the taking hold of one's person, is quintessentially a seizure .... [l]ogic ... would seem to dictate that arrests be subject to the warrant requirement to the same extent as searches." *Id.* at 428–29, 96 S.Ct. at 830–31.

20. We emphasize that our holding today is a narrow one. We merely decide that the warrantless seizure of an automobile from a public parking lot, pursuant to the standards of 21 U.S.C. § 881(b)(4), comports with the Fourth

Amendment, notwithstanding the absence of exigent circumstances. Moreover, we do not deal here with the validity of a seizure done merely as a pretext to enable a subsequent search. *See Colorado v. Bannister*, —— U.S. ——, —— n.2, —— n.4, 101 S.Ct. 42, 43 n.2, 44 n.4, 66 L.Ed.2d 142 (1980) (per curiam); *United States v. Shaefer*, 637 F.2d 200 (3d Cir. 1980).

We note that another panel of this court, considering the identical issue concurrently with us, has recently arrived at the same conclusion. *United States v. One 1977 Lincoln Mark V Coupe*, 643 F.2d 154 (3d Cir. 1981).

examined its contents. We find that argument unpersuasive.

In *Chadwick*, the Court found unconstitutional the warrantless search of the contents of a locked footlocker found in the trunk of defendant's automobile. *Id.* at 15–16, 97 S.Ct. at 2485–2486. In *Sanders*, the Court reached the same result with respect to the examination of the contents of an unlocked suitcase taken from the trunk of a taxi in which the defendant was riding. 442 U.S. at 766, 99 S.Ct. at 2594. The Court noted that probable cause justified the apprehension of the defendant and the seizure of his luggage. *Id.* at 761, 99 S.Ct. at 2592. Nonetheless, after observing the general rule that "a search of private property must be ... pursuant to a properly issued search warrant," *id.* at 758, 99 S.Ct. at 2590, the Court held that the warrantless search of the contents of the suitcase was unconstitutional. *Chadwick* and *Sanders* are based on the understanding that an arrested individual may have an independent privacy interest in the property in his possession. To intrude on that interest requires either a warrant or one of the traditional exceptions to the warrant requirement. *Id.* at 759, 99 S.Ct. at 2590. Thus, as the second circuit has recently commented:

> The critical inquiry under *Chadwick* and *Sanders* is the extent to which the object searched is protected by its owner's "reasonable expectation of privacy." An object in which the owner lacks any such expectation may be searched on the basis of probable cause when it comes lawfully into the possession of the police. On the other hand, when the object is one entitled to independent privacy protection, a warrantless search is permissible only when one of the recognized exceptions is applicable.

*United States v. Mannino*, 635 F.2d 110, 113 (2d Cir. 1980).

The *Sanders* Court explicitly noted that "[n]ot all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment." 442 U.S. at 764, n.13, 99 S.Ct. at 2593, n.13. A number of courts have since had occasion to consider the appropriate reach of *Chadwick* and *Sanders*. *See, e. g., United States v. Goshorn*, 628 F.2d 697, 700 (1st Cir. 1980); *United States v. Milhollan*, 599 F.2d 518, 526–27 (3d Cir.), *cert. denied*, 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979).[21] We conclude that it was not unreasonable for the DEA agents to search the partially exposed cardboard box they found in the trunk of Rouse's car. We deal here not with a locked footlocker or piece of luggage, but with an unsealed, indeed partially open, cardboard box. Rouse did not have a sufficient expectation of privacy with respect to the contents of that box to require the agents to obtain a warrant before searching it. We express no opinion as to whether a warrant would have been required had the box been sealed in some manner.

## V.

We have considered the other arguments raised by appellants and find them to be without merit. Accordingly, the judgments of the District Court shall be affirmed.

---

**21.** *Compare Mannino, supra;* and *United States v. Mackey,* 626 F.2d 684 (9th Cir. 1980) (upholding the warrantless searches of various containers) *with United States v. Dien,* 609 F.2d 1038 (2d Cir. 1979), *adhered to on rehearing,* 615 F.2d 10 (1980) (warrant required for search of securely taped cardboard box); and *United States v. Diggs,* 569 F.2d 1264, 1265 (3d Cir. 1977) (warrant required for search of locked metal box).