588 F.2d 1030
 4 Fed. R. Evid. Serv. 377
 UNITED STATES of America, Plaintiff-Appellee,
v.
Glen Albert CLEMENTS, Jr., Jerry Delbert Basden, John Joseph
Bruzga, CoyleAllen Winborn, Thomas David Robinson
and Homer Lee Miller, Jr., a/k/a
MikeMiller, Defendants-Appellants.
 No. 77-5492.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 2, 1979.
 
 Jim B. Brown, Canyon, Tex., for Clements, Basden, Bruzga & Winborn.
 Jerry W. Melton, Dallas, Tex., for Robinson.
 Phil Burleson, Dallas, Tex., for Miller.
 Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Shirley Baccus-Lobel, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Texas.
 Before GEWIN, RONEY and GEE, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 This is a gambling case in which the bulk of the Government's evidence was obtained through telephone wiretaps. Defendants challenge their convictions on four major grounds: First, they attack the court order permitting the telephone taps, arguing that the supporting affidavit was deficient for a number of reasons; Second, they assert the Government has failed to prove a violation of the federal gambling statute, 18 U.S.C.A. § 1955, in that there was neither (1) a violation of state law, (2) the requisite five persons in the business, nor (3) the required financial volume; Third, two defendants challenge the sufficiency of the evidence; and Fourth, they contend that the district court's instructions were erroneous. Finding that none of these contentions merit reversal, we affirm.I. Facts
 
 
 2
 In the fall of 1975, defendants Basden, Bruzga, Clements, and Winborn conducted a bookmaking operation in the panhandle region of Texas ("Amarillo operation"). At the same time, defendants Miller and Robinson were engaged in a bookmaking operation in the Dallas-Fort Worth area ("Dallas-Fort Worth operation"). Bets were taken on sporting events, mainly college and professional football games. The operations were conducted primarily over the telephone. The defendants settled with bettors on a weekly basis, usually in person.
 
 
 3
 In November 1975, on the basis of tips from informants, surveillance and an examination of telephone records, the FBI obtained an authorization to conduct electronic surveillance of several telephone lines in both locations. It produced recordings of more than 3,000 calls which led to the indictment of the defendants.
 
 
 4
 The evidence adduced by the Government tended to show that the Amarillo operation, in addition to accepting bets, regularly received line information from and made lay off bets with the Dallas-Fort Worth operation. Lay off bets are made by one professional gambler with another in order to hedge against loss because of unevenness of bets made by customers. Line information is the current odds a gambler is willing to give on each game.
 
 
 5
 All six defendants were convicted of a violation of 18 U.S.C.A. § 1955 and § 2 for being engaged in a business involving five or more persons which violated state gambling laws. Defendant Bruzga was also convicted of a two-count violation of 18 U.S.C.A. § 1084 and § 2 for knowingly using the telephone for the transmission in interstate commerce of bets on sporting events.
 
 II. The Wiretap Evidence
 
 6
 Defendants sought to suppress evidence produced by the court-ordered wiretap, attacking the underlying Government affidavit submitted to the court pursuant to 18 U.S.C.A. § 2518. They assert the affidavit was insufficient for essentially four reasons: the affidavit failed to show the requisite probable cause, failed to set forth properly that a state statute was being violated, failed to demonstrate that normal investigative procedures were inadequate, and contained misrepresentations.
 
 1. Probable Cause
 
 7
 Subsection (3) of 18 U.S.C.A. § 2518 provides that a judge may enter an ex parte order authorizing interception of wire communications "if the judge determines on the basis of the facts submitted by the applicant that (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit" certain enumerated offenses including participation in an illegal gambling operation.
 
 
 8
 When the facts that show probable cause are provided by informants, the affidavit must pass a two-pronged test: first, the judge must be informed of some of the circumstances relied upon by the informant, and second, facts must be shown from which the affiant concluded that the informant was reliable so the judge can make an independent determination of probable cause. Corroborative evidence may be used to justify reliance on an informant. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).
 
 
 9
 In his affidavit, FBI Agent Landers related information supplied by three confidential informants. The affidavit indicated that for a period of ten weeks the first informant related current and detailed information about Miller's Dallas-Fort Worth operation based on personal conversation with Miller. Corroboration was detailed in several respects. For example, information supplied by another informant corroborated Miller's claim that he conveyed line information to a large bookmaking operation in Amarillo. Information about an October 3, 1975 airport meeting was independently corroborated by local police surveillance. The affidavit also indicated that Miller had been arrested previously for gambling and fined on a bookmaking charge. The affidavit included an explicit claim of past reliability.
 
 
 10
 The information from the second informant came from a personal and recent conversation with Miller. The informant had proven reliable in supplying valuable information regarding gambling in the Dallas area for three years.
 
 
 11
 The third informant received information from conversations with defendant Bruzga in Amarillo. He was advised that a bookmaking operation was being conducted over certain phone numbers. The informant placed bets over these numbers which according to telephone company records were listed to Young Advertising Co. c/o J. Young, Room 2, Texan Motel, Wildorado. Independent surveillance during this time placed Winborn and Bruzga at Room 2 of the motel on numerous occasions. The informant was represented to be credible and reliable over a four-year period which independent investigation had showed to be correct. In addition, local records showed that Bruzga had been arrested in 1970 on a charge of unlawful bookmaking, although no conviction resulted.
 
 
 12
 The detailed information in the affidavit provided the court with ample material with which to test the reliability and credibility of the informant and the information that showed probable cause to believe that illegal activity was taking place. See United States v. Scott, 555 F.2d 522, 526 (5th Cir.), Cert. denied, 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977).
 
 2. Miscitation of State Statute
 
 13
 Defendants contend the affidavit was insufficient and the order invalid because in alleging the violation of state law, it cited a state statute that had been repealed 22 months earlier. Tex. (Penal) Code Ann. tit. 10, § 652a (Vernon).
 
 
 14
 This mistake is insufficient to invalidate the wiretap. The affidavit accurately represented that gambling was unlawful under state law. Gambling such as that conducted by defendants was illegal under Texas law. Tex. (Penal) Code Ann. tit. 10, § 47.03 (Vernon)[1] outlaws it now, rather than the repealed statute cited in the affidavit. Defendants suffered no prejudice as a result of the miscitation of the applicable Texas statute. Both the rules and the cases provide that a citation error in an indictment is not grounds for dismissal or reversal. Fed.R.Crim.P. 7(c)(3); United States v. Bethany, 489 F.2d 91, 93 (5th Cir. 1974). We see no reason to apply a different rule to affidavits for wiretaps. See United States v. Matya, 541 F.2d 741, 746-747 (8th Cir. 1976), Cert. denied, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977), which upheld the grant of a wiretap where no statute was cited in the application.
 
 
 15
 3. Inadequacy of Normal Investigative Procedures
 
 
 16
 An application for an interception order must include
 
 
 17
 a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous; . . .
 
 
 18
 18 U.S.C.A. § 2518(1)(c).
 
 
 19
 Defendants contend the application contained only the conclusion by Special Agent Landers that standard investigative techniques have not succeeded. Landers testified at the hearing on the motion to suppress that it was standard procedure in a gambling case to seek a wiretap. Defendants argue that to approve such an approach would effectively undermine any prior resort to other investigative procedures as required by the Act.
 
 
 20
 The affidavit, however, did refer to the unwillingness of confidential informants to testify, the difficulty in developing a case through informants, and the limited value of searches in gambling operations. This information was sufficient for the court to make an independent determination of the necessity of the wiretap. As this Court has held, the purpose of § 2518(1)(c) "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." United States v. Pacheco, 489 F.2d 554, 565 (5th Cir. 1974), Cert. denied, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). The provision "must be read in a common sense fashion." United States v. Robertson, 504 F.2d 289, 293 (5th Cir. 1974), Cert. denied, 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975); United States v. Sklaroff, 552 F.2d 1156, 1159 (5th Cir. 1977), Cert. denied, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978). Especially where the telephone itself is the means by which the crime takes place, regular resort to wiretap is not unreasonable. The fact that a wiretap is regularly utilized does not render the application and averment of the unsatisfactory nature of conventional techniques a mere formality.
 
 4. Misrepresentations
 
 21
 Defendants claim the affiant made an intentional misrepresentation in the application for a search warrant. They point to an apparent conflict between the statement in the wiretap application that permanent records are not maintained by gambling operations and the statement in the search warrant application that there generally were large amounts of cash, betting slips, line sheets, adding machines, tape recorders, and an address book on the premises. The trial court was correct in its conclusion that there was no inconsistency between these statements. The suggestion that a search might net temporary records hardly contradicts the statement that gamblers do not keep permanent records.
 
 
 22
 5. Use of Chapman Tapes for Voice Comparison
 
 
 23
 Defendant Robinson shows that a voice identification of him, set forth in an affidavit for search warrants, was based on a 1971 wire interception. He contends that in United States v. Chapman, CR3-2984 (N.D.Tex., order entered 6/15/76), District Judge Hughes by injunctive order prohibited institution of criminal charges based on information contained in the 1971 tapes. There is a question whether Judge Hughes' order applied to these wire interceptions at all. Assuming that it did, however, the order was not entered until June 1976, six months after the voice comparison which occurred in December 1975. In any event, it does not appear that the search produced any evidence seized from premises in which defendant had an interest.
 
 
 24
 The trial court properly denied the motion to suppress the evidence produced from execution of the warrant.
 
 III. Violation of Federal Law
 18 U.S.C.A. § 1955 provides that:
 
 25
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 
 
 26
 (b) As used in this section
 
 
 27
 (1) "illegal gambling business" means a gambling business which(i) is a violation of the law of a State or political subdivision in which it is conducted;
 
 
 28
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 
 
 29
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 
 
 30
 In order to establish a violation of this section that a defendant is involved in a gambling business in violation of this statute, it is necessary to prove that (1) there has been a violation of the law of a state, (2) five or more persons are involved in the operation of the business, and (3) the operation has continued more than thirty days or grossed more than $2,000 in a single day.
 
 1. Violation of State Law
 
 31
 Defendant Robinson contends that no violation of state law was proved because the Government failed to establish the alleged gambling business violated state law and did not request the court to take judicial notice of it.
 
 
 32
 There is no question that there was a violation of Texas law. Section 47.03 of the Texas Penal Code plainly prohibits bookmaking. Section 47.03 was brought to the court's attention by the Government in its proposed instructions. The determination of the applicable state law is a question of law to be determined by the court. See Hanley v. United States, 416 F.2d 1160, 1164 (5th Cir. 1969), Cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). A court may properly take notice of a state law. The court properly instructed the jury on the applicable law.[2] No error has been shown.
 
 2. Five or More Persons
 
 33
 18 U.S.C.A. § 1955 only applies to an illegal gambling business which "involves five or more persons . . .." In this case, the contention is made that the Amarillo business, involving four defendants in this case, could not properly be combined with the Dallas-Fort Worth business, involving two defendants, to satisfy the statutory requisite of "five or more persons." As far as the evidence in this case is concerned, the two businesses must be linked in order to sustain the conviction of all of these defendants.
 
 
 34
 The evidence is clearly sufficient to satisfy the law of this Circuit as to the required nexus of two apparently separate gambling businesses in order to treat them as one. The simple facts are these: the Dallas-Fort Worth business regularly gave line information to and accepted lay off bets from the Amarillo operation.
 
 
 35
 In a series of gambling cases involving two operations, this Court has described the nature of such businesses, their dependency upon each other for profitable operation, and the reasons why they can be combined for the purpose of achieving the statutory requirement of five or more persons. United States v. Boyd, 566 F.2d 929 (5th Cir. 1978); United States v. Milton, 555 F.2d 1198 (5th Cir. 1977); United States v. McCoy, 539 F.2d 1050 (5th Cir. 1976), Cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); United States v. Joseph, 519 F.2d 1068 (5th Cir. 1975), Cert. denied, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976), 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977).
 
 
 36
 The principle of law established by this line of cases is this: where two or more otherwise separate operations which are engaged in the accepting and placing of bets on national sporting activities exchange line information regularly as to betting odds and place lay off bets with each other, they may be treated as one business for the purpose of meeting the five or more persons requirement of 18 U.S.C.A. § 1955.
 
 
 37
 There is a difference between this case and those that have heretofore been decided. Our prior opinions have discussed the "exchange of line information." Here, there was no "exchange" in the technical sense. Dallas-Fort Worth only gave line information; Amarillo only received it. Amarillo only placed lay off bets with Dallas-Fort Worth; it did not accept bets from Dallas-Fort Worth.
 
 
 38
 This difference is not controlling. The rationale of the prior opinions was that the dealing with each other was an essential ingredient to the success of both operations. So it was here. Amarillo had to regularly receive line information and place lay off bets in the proper operation of its business. The receipt of lay off bets and the giving of line information was essential to the Dallas-Fort Worth operation.
 
 
 39
 We perceive no error in combining the two businesses under the precedent of our prior cases.
 
 
 40
 Although defendants object to testimony by an expert witness characterizing Amarillo's bets with Dallas-Fort Worth as lay off bets, we have previously sustained the use of expert witnesses to explain the nature of this kind of gambling business and to evaluate the evidence within the framework of the witnesses' expertise. See United States v. Masson, 582 F.2d 961 (5th Cir. 1978); United States v. Milton, 555 F.2d 1198 (5th Cir. 1977); United States v. McCoy, 539 F.2d 1050 (5th Cir. 1976), Cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977).
 
 
 41
 3. Gross Revenue in Excess of $2,000 Per Day
 
 
 42
 Defendant Miller contends that there was no admissible evidence that the gross revenue of the operation was in excess of $2,000 per day. A Government expert testified that the total daily dollar volume of bets placed over the monitored telephone lines at the two locations based on an analysis of the approximately 3,000 calls totaled $899,855 for the twelve-day period.[3] The lowest daily total on lines 233-2262 and 2272 was $26,400 for November 27, 1975. The lowest daily total on the motel phones was $8,395.
 
 
 43
 Defendant argues that the testimony was improper as not all 3,000 tapes had been played to the jury. This argument ignores the fact that the trial tape played to the jury contains evidence that on December 7, 1975, bets totaling $34,000 were made between the Dallas-Forth Worth and Amarillo operations.[4] This figure alone satisfies the statutory requirement.
 
 
 44
 The expert's calculations were admissible under Fed.R.Evid. 1006 which provides that:
 
 
 45
 The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.
 
 
 46
 This rule was intended precisely for a case such as this where it would have been unnecessarily time-consuming to play the tapes of all 3,000 calls. For the purposes of Fed.R.Evid. 1006, the recordings need not have been introduced into evidence but only "made available." They were available.
 
 
 47
 An adequate foundation was laid for both the recordings and the "trial tape." An FBI agent with considerable experience in telephone interceptions testified in elaborate detail as to the mechanics of the wiretap. The accuracy of the equipment and training of the monitoring agents was established. Defendants made no objection as to the accuracy of the tapes, although afforded ample opportunity to examine them. The recordings were properly admitted. United States v. Biggins, 551 F.2d 64, 66 (5th Cir. 1977).
 
 
 48
 Contrary to defendant's argument, the criteria established by the Eighth Circuit in United States v. McMillan, 508 F.2d 101 (8th Cir. 1974), Cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), Cited in United States v. Onori, 535 F.2d 938, 947-948 (5th Cir. 1976), for the admission of recordings made by agents with the consent of an informant/participant do not apply where telephone conversations are monitored pursuant to court order, are voluntary and are not elicited by the Government. Cf. United States v. Biggins, 551 F.2d 64, 66 (5th Cir. 1977).
 
 IV. Sufficiency of the Evidence
 
 49
 Defendants Basen and Clements question the sufficiency of the evidence against them to support a conviction. The statute reaches all those who "conduct, finance, manage, supervise, direct, or own all or part" of an illegal gambling business. Employees are included. "The term 'conducts' refers both to high level bosses and street level employees." (1970) U.S.Code Cong. & Admin.News, p. 4029, House Judiciary Committee Report. Anyone who performs a " necessary function" in the operation of the enterprise is included within the sweep of the statute. United States v. McCoy, 539 F.2d 1050, 1060 (5th Cir. 1976), Cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); United States v. Joseph, 519 F.2d 1068, 1071 (5th Cir. 1975), Cert. denied,424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976), 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977).
 
 
 50
 Taken most favorably to the Government, the evidence shows that Basden rented a motel room in a fictitious name which was used in the conduct of the gambling operation. Telephone lines in the motel room listed under the fictitious name and others located elsewhere in Basden's own name were used for gambling. Basden was the payee of one check issued in payment of gambling debts and his business was the payee of another. This evidence was sufficient to support a jury conclusion that beyond a reasonable doubt Basden performed a function necessary to the operation.
 
 
 51
 Clements conveyed winnings from bets to a bettor on four different occasions. He was present when Basden, using a fictitious name, rented the motel room subsequently used for the operation. In addition, two telephones used for gambling were registered in his name.
 
 
 52
 Clements asserts there was no proof that the two telephone lines were located at his residence and that he was unaware of the purpose of the four payments or the motel rental. The telephone bills submitted into evidence were billed to Clements. Viewed most favorably to support the conviction, the evidence was sufficient to support a jury conclusion of guilt beyond a reasonable doubt.
 
 V. Instructions
 
 53
 Defendants raise several unmeritorious objections to the trial court's instructions. They object to the denial of a proposed instruction that a conviction cannot be obtained unless the evidence excludes every reasonable hypothesis of innocence. The rule in this Circuit is that "when the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect." United States v. Stokes, 471 F.2d 1318 (5th Cir. 1973), Relying upon Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).
 
 
 54
 The instructions referring to "aiding and abetting" and on "agency" were justified by the evidence in the record.
 
 
 55
 Defendants complain about the court's reference to the purpose of Congress in enacting 18 U.S.C.A. § 1955. The court stated that
 
 
 56
 (S)ection 1955 was enacted pursuant to the power of Congress to regulate interstate commerce. It seeks to reach substantial gambling businesses which operate regularly, as distinguished from isolated or unsubstantial gambling operations.
 
 
 57
 This charge clarifies the intended scope of § 1955, is proper, and does not prejudice defendants.
 
 
 58
 The definition of "business," examined in light of the entire charge and taken together with the instruction on congressional purpose, makes it clear that an illegal gambling business must be substantial and operate on a regular basis. See, e. g., United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir. 1976), Cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977).
 
 
 59
 The term "conduct" as defined adequately reflects the law of this Circuit.
 
 
 60
 Defendants complain that the charge does not focus on issues peculiar to linking two independent gambling operations and that no definition of exchange of line information or lay off bets was given. They contend the jury should have been instructed that not every bet between bookmakers is a lay off bet and that occasional contacts or random encounters between the Dallas-Fort Worth and the Amarillo operations do not constitute a violation of § 1955. The terms "lay off," "line information," and "exchange of line information" were the subject of expert testimony. The court's instructions made it clear that a mere customer or bettor is not a participant in a gambling operation, and that a mere occasional bet would not create an illegal gambling operation.
 
 
 61
 Defendants contend the court should have instructed the jury that the defendants must know that five or more persons were involved. In United States v. Alfonso, 552 F.2d 605, 617 (5th Cir.), Cert. denied, 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977), this Court upheld a refusal to give such an instruction.
 
 
 62
 Defendants' objection to the court's instruction that the jurisdictional five persons may include unnamed and unindicted persons is not only academic because seven were named and five properly convicted, but also incorrect. In United States v. Boyd, 566 F.2d 929 (5th Cir. 1978), this Court held that an unknown outside source of line information could be included for purposes of the jurisdictional five.
 
 VI. Conclusion
 
 63
 Finding the rulings and instructions of the trial court to be supported by the facts and the law and the verdict of the jury to be supported by sufficient evidence, we affirm defendants' convictions.
 
 
 64
 AFFIRMED.
 
 
 
 [1]
 Tex. (Penal) Code Ann. tit. 10, § 47.03 (Vernon) reads:
 Gambling Promotion
 (a) A person commits an offense if he intentionally or knowingly does any of the following acts:
 (1) operates or participates in the earnings of a gambling place;
 (2) receives, records, or forwards a bet or offer to bet;
 (3) for gain, becomes a custodian of anything of value bet or offered to be bet;
 (4) sells chances on the partial or final result of or on the margin of victory in any game or contest or on the performance of any participant in any game or contest or on the result of any political nomination, appointment, or election or on the degree of success of any nominee, appointee, or candidate; or
 (5) for gain, sets up or promotes any lottery or sells or offers to sell or knowingly possesses for transfer, or transfers any card, stub, ticket, check, or other device designed to serve as evidence of participation in any lottery.
 (b) An offense under this section is a felony of the third degree.
 
 
 [2]
 In its instructions, the trial court read the entire text of Tex. (Penal) Code Ann. tit. 10, § 47.03 (Vernon), Id. The instruction then continued:
 Section 47.03 defines and prohibits exploitative gambling. It is aimed at the professional gambler, one who solicits or aids others to gamble and profits from the gambling by playing with advantageous odds or by charging the other participants for use of the facilities or equipment. These are the elements that distinguish social gambling, in which the only possibility of exploitation arises from the superior skill of a player, from commercial gambling, in which the promoter is ensured a profit regardless of his skill or luck in playing the game.
 
 
 [3]
 Total calls to 233-2262 and 2272
 11/27 - 12/8
11/27 $ 26,400.00
11/28 106,980.00
11/29 81,400.00
11/30 132,050.00
12/1 40,650.00
12/2 37,300.00
12/3 39,375.00
12/4 32,975.00
12/5 69,650.00
12/6 106,475.00
12/7 166,600.00
12/8 42,000.00
 ------------
Total $ 881,855.00
Total calls on motel phones
11/27 $ 9,605.00
11/28 8,395.00
 ------------
Total $ 18,000.00
Grand total for the 12-day period. $ 881,855.00
 18,000.00
 ------------
 $ 899,855.00
 
 
 [4]
 Amounts of bets on 12/7 between Dallas-Fort Worth and Amarillo:
 Call 1 $ 12,800.00
Call 2 4,000.00
Call 3 12,000.00
Call 4 6,000.00
 -----------
Total $ 34,800.00