**UNITED STATES of America, Plaintiff,**

v.

**Edwin J. SWAN, Donald J. Delcollo, and Gabriel Menei, Defendants.**

Crim. A. No. 82–16.

United States District Court,
D. Delaware.

July 30, 1982.

Joseph J. Farnan, Jr., U. S. Atty., and Peggy L. Ableman, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Joseph W. Benson and Bartholomew J. Dalton of Brandt & Benson, Wilmington, Del., for defendant Edwin J. Swan.

Carl Schnee of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendant Donald J. DelCollo.

Joseph A. Hurley, Wilmington, Del., for defendant Gabriel Menei.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

Defendants, Edwin J. Swan, Donald J. DelCollo, and Gabriel Menei, are charged in a six count indictment with the transmission of bets and wagering information over wire communication facilities while engaged in the business of gambling, in violation of 18 U.S.C. §§ 1084 and 2.[1] (Docket Item ["D.I."] 1.) Each defendant has filed motions to dismiss the indictment and to suppress evidence which the government intends to use at trial. (D.I. 23, 25, 26, 27, 28 and 34.) In addition, defendant Swan has moved for certain discovery which he claims is necessary to present a viable defense. (D.I. 24.) An evidentiary hearing was held on defendants' motions on June 15, 1982 (D.I. 41), and defense counsel and the government have submitted memoranda on the issues presented therein. (D.I. 38, 39, 42, 43, 46, 47, 48.) This memorandum

opinion represents the Court's disposition of these motions.

## I. Pre-Indictment Delay

The indictment in this case covers criminal activity which allegedly occurred over a ten-day period, from January 19, 1981 to January 29, 1981. Because the indictment was not returned until April 28, 1982, some 15 months after the last criminal act had purportedly occurred, the defendants argue that the indictment must be dismissed on the ground of prejudicial pre-indictment delay. Collectively, defendants point to three sources of federal authority which allegedly have been transgressed by the 15-month hiatus—the Sixth Amendment right to a speedy trial, the due process clause of the Fifth Amendment, and Rule 48(b), F.R. Cr.P.

The Sixth Amendment Speedy Trial clause merits little discussion. The protections of that clause are activated only when a criminal prosecution has been formally initiated—either by arrest, indictment or other official accusation. *United States v. MacDonald,* —— U.S. ——, ——, 102 S.Ct. 1497, 1500, 71 L.Ed.2d 696 (1982); *United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). This inescapable conclusion rests on the clear language of the Amendment itself, which speaks only to "criminal prosecutions,"[2] and a consideration of the purposes which it serves. Unlike the due process clause, whose proscription against inordinate delay is grounded in a concern for the defendant's ability to present an effective defense, the speedy trial guarantee is designed to curtail ancillary, but equally adverse, consequences flowing from the fact of criminal accusations. Its purpose is to "minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of

---

1. As originally filed, the indictment charged five defendants with violations of § 1084. Defendant Matthew Whitaker was dismissed from this case on June 10, 1982, upon motion of the government and with the approval of the Court. (D.I. 36.) Defendant James J. Igo entered a plea of guilty to Count I of the indictment on June 30, 1982 (D.I. 44).

2. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...."

liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States v. MacDonald, supra*, 102 S.Ct. at 1502. Obviously, these considerations are engaged only after formal charges have been filed or a defendant has been actually restrained by the public act of arrest. *United States v. Marion, supra*, 404 U.S. at 320, 92 S.Ct. at 463. Since neither of these crucial elements occurred in this case, resort to the Sixth Amendment is unavailing.

█ Nor can Rule 48(b), F.R.Cr.P., provide a basis for a claim of prejudicial pre-indictment delay. This Rule provides for the dismissal of an indictment, information or complaint "[i]f there is unnecessary delay in presenting the charge to the grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial. . . ." Like the Sixth Amendment Speedy Trial Clause, this rule is implicated only in post-arrest situations, where a formal criminal charge has been lodged against the defendant. It does not apply to a period of delay between the commission of the underlying offense and the commencement of an official criminal prosecution. *See United States v. Marion, supra*, 404 U.S. at 319, 92 S.Ct. at 462; *United States v. Dukow*, 453 F.2d 1328, 1330 (3d Cir.), *cert. denied sub nom. Crow v. United States*, 406 U.S. 945, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972); *Nickens v. United States*, 323 F.2d 808, 809 (D.C.Cir.1963), *cert. denied*, 379 U.S. 905, 85 S.Ct. 198, 13 L.Ed.2d 178 (1964); *Hoopengarner v. United States*, 270 F.2d 465, 469 (6th Cir. 1959).

█ The only federal source then, which arguably could require dismissal of

an indictment in the face of lengthy pre-indictment delay, is the Fifth Amendment due process guarantee. This right, which is "primarily intended to prevent prejudice to the defense caused by the passage of time," *United States v. MacDonald, supra*, 102 S.Ct. at 1502, may be invoked, however, only if two criteria are met. First, the defendant must show that the pre-indictment delay caused substantial prejudice to his right to a fair trial. Second, the defendant must prove that the delay was an intentional device by the government to gain a tactical advantage over the defendant. *United States v. Marion, supra*, 404 U.S. at 324, 92 S.Ct. at 465; *see United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). Neither element has been met in this case. No specific facts have been either alleged or proved to demonstrate actual prejudice to the defendants and there has been no proof adduced whatsoever to demonstrate that the government intentionally delayed the filing of formal charges in this case to gain some advantage over the defendants. Defendants have simply cited the 15-month period, without more, as the basis for their claim. This fact, in and of itself, is legally insufficient to warrant dismissal of the indictment. *See United States v. Marion, supra*, 404 U.S. at 325–26, 92 S.Ct. at 465–466; *United States v. Benson*, 487 F.2d 978, 985 (3d Cir. 1973); *United States v. Dukow, supra*, 453 F.2d at 1330.

## II. *Suppression of Wiretap Evidence*

Defendants have moved to suppress all telephonic recordings obtained pursuant to wiretaps placed on seven telephone lines subscribed to certain of the defendants and one third party not named in the indictment.[3] These wiretaps were authorized in

---

**3.** Five of the seven telephone lines were subscribed to defendant, Edwin Swan. The remaining two lines were subscribed to defendant James Igo, who has entered a plea of guilty to Count I of the indictment, and non-defendant, Lee Cohen, respectively. At the outset, the Court is thus confronted with questions surrounding the standing of the remaining defendants to challenge the wiretap orders. Under federal law, only an individual who was a party

to an intercepted conversation or against whom the interception was directed has standing to challenge a wiretap order as an "aggrieved person." *See* 18 U.S.C. §§ 2510(11), 2518(10)(a); *United States v. Armocida*, 515 F.2d 29 (3d Cir.), *cert. denied sub nom. Gazal v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). The applications for wiretaps do not facially indicate that any interception was directed toward either DelCollo or

three separate orders by Judge Joseph T. Walsh of the Superior Court of the State of Delaware under the provisions of the Delaware Wiretapping and Electronic Surveillance Act, 11 *Del.C.* § 1336. (D.I. 41, Gov't ex. 1, 2 & 3.) The taps were applied for, and implemented and monitored by, officers of the Wilmington Police Department.

■ Under federal law, wiretap evidence properly obtained by state officials under the authority of a state electronic surveillance statute may permissibly be used in a federal prosecution, so long as the state statute conforms to the minimum requirements outlined by the federal wire interception statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968. *See* 18 U.S.C. § 2516(2). Neither party disputes the fact that the Delaware wiretapping statute is in all material respects virtually identical to Title III. Accordingly, if the wiretap orders were valid under state law, they would likewise be valid under federal law. Because of the congruence between the state and federal statutes, moreover, the propriety of the warrants authorizing the electronic surveillance in this case may be measured by federal statutory standards.

Defendants have attacked the wiretap orders on three separate grounds: First, they claim that the affidavit underlying the initial application for a wiretap, which was also extensively relied upon in the two succeeding applications, failed to demonstrate the requisite probable cause. Second, defendants claim that the government failed to satisfy the "necessity" requirement of Title III, viz., that efforts to obtain incriminating evidence through normal investigative procedures either were unsuccessful, were unlikely to succeed if tried, or were too dangerous to attempt. Finally, defendants challenge the authorization of wiretap

interception for the hours from 9:00 a. m. to 10:00 p. m. on grounds of overbreadth, arguing that the facts contained in the affidavit do not support surveillance for such an extended period. These contentions will be addressed in turn.

### A. *Probable Cause*

Under § 2518 of Title III, wire interception may be authorized only if the reviewing judge determines:

(a) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in [18 U.S.C. § 2516].[4]

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception.

\*   \*   \*   \*   \*   \*

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

■ The principles by which this Court must be guided in determining whether probable cause, as outlined above, existed in this case are firmly established. Probable cause must be determined solely on the basis of that evidence initially presented to the magistrate or judge—in this case the facts contained within the four corners of the affidavit submitted in support of the wiretap applications. 18 U.S.C. § 2518(3); *see United States v. West*, 508

Menei. Further, the Court has not yet seen transcripts of the actual conversations sought to be suppressed, and it cannot determine at this juncture whether either of these defendants were parties to monitored conversations. Because the government has not raised the standing issue, however, and because the Court concludes that the wiretap orders are valid in any event, the Court will assume for purposes of this memorandum opinion that each of the

defendants in this case has standing to challenge the use of the intercepted communications at trial.

4. There is no dispute that the offense with which defendants are charged in the indictment, violations of 18 U.S.C. § 1084, is one of the criminal offenses enumerated in § 2516. *See* 18 U.S.C. § 2516(1)(c).

F.Supp. 1028, 1031 (D.Del.1981), *aff'd without opinion,* —— F.2d —— (3d Cir. 1982). In addition, it is axiomatic that "only the probability, and not a prima facie showing, of criminal activity is the standard for probable cause." *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). In discharging its reviewing function, the Court is also mindful of the fact that the commands of the Fourth Amendment must be implemented in a practical manner. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965). Affidavits, like the one involved here, submitted in support of a search warrant must be read in common-sense and realistic terms without inordinate attention to overly technical details. *Id.* at 108, 85 S.Ct. at 745; *United States v. Johnson,* 645 F.2d 865, 867 (10th Cir.), *cert. denied sub nom. Abiledinger v. United States,* 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981). Finally, lest police officers be unduly discouraged from presenting their evidence to an impartial judicial officer before conducting a search, reviewing courts should resolve all marginal cases in favor of the validity of the warrant. *United States v. Ventresca, supra,* 380 U.S. at 108–109, 85 S.Ct. at 745–746. It is against this backdrop, that the Court must judge the legal sufficiency of the affidavit submitted in support of the first application for a wiretap.

The salient points of the affidavit may be briefly summarized as follows: the target of the Wilmington Police Department investigation was defendant Edwin Swan, who, along with James Igo and certain other associates, was believed to be engaged in large scale bookmaking activities in Wilmington, operating almost exclusively by telephone. A profile of each of the suspects named in the affidavit reveals that both Swan and Igo, as well as other unindicted suspects, had been arrested on several previous occasions for gambling related activities.

Three of the telephone numbers for which wiretaps were sought were subscribed to Swan. Two of these numbers, (302) 429–0168 and (302) 429–0176, were installed at 2132 North Market Street, Wilmington, and were published numbers trading as ITR Incorporated and I & R Video Productions. A check with the relevant state and city authorities revealed that neither company possessed a city business license and no state certificate of incorporation could be found for ITR, Inc. The third telephone line subscribed to Swan, (302) 655–1302, was installed at 2 East 22nd Street, Wilmington, which is the rear entrance of the building located at 2132 North Market Street. The fourth and final telephone number for which a wiretap was sought in this application, (302) 571–9225, was subscribed to James Igo at 234 South Colonial Avenue, Wilmington.

The affidavit heavily relies upon information provided by a confidential informant, who worked closely with Special Agent Angelo Lano of the Wilmington field office of the F.B.I. The identity of this informant was unknown to the four Wilmington police officers who drafted the affidavit; all information which the informant supplied concerning the defendants was conveyed to Agent Lano, who then relayed the data to the affiants. This informant advised Agent Lano during the week of October 19, 1980, that Swan and another man, known to the informant only as "Jim," were conducting a large scale bookmaking operation from the rear of a laundromat located at the intersection of Market Street and Concord Pike in Wilmington. The telephone numbers used in this operation were identified as (302) 655–1302 and (302) 571–9225.

In subsequent weeks, the informant advised Lano that Swan and "Jim," now identified as James Igo, were booking bets on horse races, and collegiate and professional football and basketball games, that Igo had been arrested by an unknown agency and all the football "pools" for Swan's operation were confiscated at that time, and that the laundromat was located on 22nd and Market Streets in Wilmington. The informant also described certain features of the telephones employed to receive bets and other physical characteristics of the room in which the bookmaking was conducted.

This informant continued to provide information up until January 12, 1981, that Swan, Igo and their associates were engaged in illegal bookmaking activities.

Portions of the information supplied by the informant were corroborated by the Wilmington police officers. A few days after word of Igo's arrest was relayed by Agent Lano to the affiants, they discovered through the Chester Police Department that Igo had in fact been arrested by Chester police during the execution of a search warrant on a shop engaged in printing football "pools." In addition, at the time of his arrest, Igo was using an automobile which had been leased to Edwin Swan. The Chester Police Department also advised the affiants that as a result of an ongoing investigation into gambling operations in Chester County, they had discovered that Swan was conducting a bookmaking operation in Wilmington, using telephone number (302) 571–9225. Also involved in this operation was a man named Vincent Manetti, his son, Vincent Manetti, Jr., Alexander Ballas and other individuals unknown to the Chester Police Department.

At the time this information was received, the Wilmington Police Department was conducting its own investigation into an illegal sports bookmaking operation involving Alexander Ballas, which purportedly was operating out of Rockford Tower Apartments in Wilmington. On November 22, 1980, police executed a Municipal Court search warrant at the apartment house and seized gambling records, wagers and telephone numbers. In addition, one of the affiants, Detective Cooper, took over the telephones being employed in the operation and "booked" approximately $7,000 in bets in one hour, including "lay-off" bets from a person known to the officer as Vincent Manetti.

The Wilmington police also ascertained the location of the laundromat based upon information supplied by the informant, and confirmed that certain of the telephone numbers installed at that address, including (302) 655–1302, were subscribed to Swan. In addition, as a result of physical surveillance initiated by the police, the car leased to Swan was observed on several occasions parked outside the laundromat and Swan himself was observed inside the house at least once, through the open window. Finally, police ascertained that telephone number (302) 571–9225, subscribed to Igo at 234 South Colonial Avenue, was a non-published number equipped with call forwarding and call waiting features. Based upon this information, the informant's tips, and the results of certain telephone calls placed by police to that number, as well as other numbers purportedly involved in the bookmaking operation, police concluded that calls made to (302) 571–9225 were likely being forwarded to (302) 429–0168 and (302) 429–0176, the telephone numbers installed at 2132 North Market Street.

· As a result of the foregoing evidence of possible illegal gambling activities, records were subpoenaed from Diamond State Telephone Company of all toll calls over a six month period, from June to December, 1980, billed to, or made from, the various telephone facilities sought to be monitored, as well as two other numbers subscribed to Swan and located at his home in Newark, Delaware. The records indicated that all of the phone facilities were equipped with call forwarding and call waiting features. An analysis of the various toll calls placed or received established, moreover: (1) that a substantial number of calls were made to "sports services," organizations which formulate "odds" for certain sporting events based on inside information obtained from professional handicappers and price makers; (2) that large numbers of calls were placed to "sports phones," recorded messages of sports scores, player injuries and other miscellaneous sports information; and (3) that large numbers of calls were placed to a telephone number subscribed to Vincent Perry, trading as Summit Beef Company. The affidavit avers that Perry was previously arrested by Delaware police in 1976 for receiving and recording bets and wagers and for providing a premises for gambling activities. Moreover, investigative reports of the F.B.I. established that Perry was a known associate of two individuals who

were themselves previously targeted for local wiretaps in 1979 and 1980 for alleged gambling and organized crime violations.

Defendants' objections to this affidavit principally focus on the unidentified confidential informant. Defendants argue that without the information supplied by the informant, the affidavit would not demonstrate probable cause, and because neither the informant's credibility, nor the accuracy of his information has been firmly established, the affidavit is fatally defective. In particular, defendants criticize the fact that the identity of the informant was unknown not only to the state judge who issued the wiretap order, but also to the Wilmington police officers who drafted the affidavit. The use of this "double hearsay," purportedly imposed upon the affiants a greater responsibility to elucidate specific and particularized facts to support the reliability of the informant.

The legal sufficiency of an informant's tip must be judged under the standards laid out by the Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Under the two-pronged test set forth in those opinions, an affidavit which exclusively relies upon an informant must contain facts sufficient to demonstrate: (1) that the informant was credible or his information reliable; and (2) that the informant based his conclusions on adequate knowledge, and not mere rumor or suspicion. *Aguilar v. Texas, supra*, 378 U.S. at 109, 84 S.Ct. at 746; *Spinelli v. United States, supra*, 393 U.S. at 413, 89 S.Ct. at 587. These criteria apply in all situations involving an informant and no distinctions are drawn between information gathered from tertiary sources and information supplied directly to the affiant from an informant. *See United States v. Button*, 653 F.2d 319, 324 n. 6 (8th Cir. 1981). In each case in which an informant is concerned, the reviewing official must evaluate the affidavit as a whole and simply determine whether the informant gained his information in a reliable way and was reasonably

trustworthy. *See United States v. Skramstad*, 649 F.2d 1259, 1263 (8th Cir. 1981).

The first prong of the *Aguilar-Spinelli* test clearly has been met in this case. The affidavit explicitly states that the informant "has provided information over the last seven years which has led to arrest and convictions of numerous persons in Federal and State Courts for Gambling related offenses." A similar recitation of past assistance was recently held sufficient by the Third Circuit to establish an informant's reliability. *See United States v. Marino*, 682 F.2d 449, 453 (3d Cir. 1982). Thus, no additional data beyond this brief history is required.

The other "more critical prong" of the *Aguilar-Spinelli* test, the requirement that the affidavit demonstrate facts sufficient to conclude that the informant based his information on adequate knowledge, *id.* at 453, presents a closer case. The affidavit summarily avers that the information supplied by the informant "is based upon first hand knowledge and personal observation." The affidavit nowhere identifies, however, whether, and to what extent, particular disclosures were the result of direct observation, or were the product of "first hand knowledge," and what that latter term is intended to connote. In the absence of more specific statements detailing the specific manner in which each incriminating piece of evidence was gathered, this single cursory conclusion ordinarily would be an inadequate basis on which to credit the informant's disclosures.

On the other hand, where the basis of an informant's knowledge is not sufficiently disclosed in an affidavit, a heightened degree of specificity may serve to verify the accuracy of the information he provides. *See United States v. Bush*, 647 F.2d 357, 363 (3d Cir. 1981). Such detail may allow a magistrate or judge to conclude that the informant gained his information in a reliable way. *Id.* In this case, the informant did describe the alleged criminal activity with some degree of specificity, such that a reviewing judge or magistrate, could possibly infer that he was "relying on

something more than a causal rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States, supra,* 393 U.S. at 416, 89 S.Ct. at 589.

The Court need not resolve this dilemma, however, because satisfaction of the second prong of the *Aguilar-Spinelli* test is not necessary for a finding of probable cause in this case. Full compliance with the criteria collectively enunciated by the Supreme Court opinions must be made only when an affidavit relies exclusively on hearsay information provided by a confidential informant. *Spinelli* teaches that in instances, such as this, where the affidavit provides evidence beyond that supplied by an informant, the informant's tip, albeit insufficient standing alone to establish probable cause, may properly be considered in conjunction with all other facts as one element "in the probable cause equation." *United States v. Bush, supra,* 647 F.2d at 365; *Spinelli v. United States, supra,* 393 U.S. at 418, 89 S.Ct. at 590. If the totality of facts recounted in the affidavit, including the informant's tip, provide sufficient indicia of criminal activity to satisfy the probable cause standard, then a search warrant may issue.

That the affidavit as a whole establishes the requisite probable cause in this case cannot be seriously doubted. The prior criminal records of Swan, Igo and their associates, the information provided by the informant, the corroboration of the informant's tips, the data supplied by the Chester Police Department, the records subpoenaed from the telephone company, and the independent investigation of the Wilmington police officers, considered in tandem, amply demonstrate probable cause to believe that Swan and Igo were engaged in illegal bookmaking activities, conducted primarily through the telephone facilities targeted for surveillance. As the Court of Appeals for the D. C. Circuit has observed, "probable cause is the sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers. [The

Court must] weigh not individual layers but the 'laminated' total." *Smith v. United States,* 358 F.2d 833, 837 (D.C.Cir.1966), *cert. denied,* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). Although none of the foregoing elements, considered in isolation, would likely establish probable cause, when read as an integrated whole they are sufficient to justify the wiretap order.

## B. *Necessity Requirement*

Defendants alternatively argue that the affidavit failed to establish the so-called "necessity" requirement of Title III. Under 18 U.S.C. § 2518(1)(c), each affidavit submitted in support of a wiretap order must contain a "full and complete statement" detailing "whether or not other investigative procedures have been tried and failed, or, why they reasonably appear to be unlikely to succeed if tried, or to be too dangerous." A wiretap order may then be issued only if, on the basis of the facts submitted, the reviewing judge concurs in the government's assessment, viz., that normal investigative procedures either were unsuccessful, were unlikely to succeed if tried, or were too dangerous to attempt. 18 U.S.C. § 2518(3)(c). Although Judge Walsh made the requisite finding in this case, defendants challenge his conclusion on the ground that the government showing in support thereof was inadequate.

The purpose of the provisions described above is to insure that the statutory authority encompassed within Title III is used sparingly and with restraint. *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974). Congress intended the surreptitious interception of wire communications to be authorized only in unusual cases, where conventional investigative techniques would be unlikely to uncover criminal activity. *United States v. Kahn,* 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 983 n.12, 39 L.Ed.2d 225 (1974); *United States v. Vento,* 533 F.2d 838, 849 (3d Cir. 1976). These procedures were not intended "to be routinely employed as an initial step in criminal investigation." *United States v. Giordano, supra,* 416 U.S. at 515, 94 S.Ct. at 1826.

■ At the same time, despite its concern for the potential abuse of Title III surveillance, Congress chose not to unduly discourage enforcement officials from the legitimate use of wire interception and, so, adopted a pragmatic approach to implementing the provisions of § 2518. As the legislative history indicates, the showing made by the government under § 2518(1)(c) must be "tested in a practical and commonsense fashion." S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 2112, 2190. Drawing on this language, the courts have held that the statutory burden placed on the government by § 2518(1)(c) "is not great." *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976); *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.), *cert. denied sub nom. Gazal v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *see United States v. Daly*, 535 F.2d 434, 438 (8th Cir. 1976); *United States v. Smith*, 519 F.2d 516, 518 (9th Cir. 1975). Electronic surveillance is not foreclosed until every other imaginable mode of investigation has been unsuccessful. *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir.), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1974). Nor is wire interception to be used only as a last resort. *United States v. Lanmesser*, 553 F.2d 17, 20 (6th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977). The government need show only "that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976). So long as the basis for this conclusion is fully explained to the judge, and a reasonable factual predicate exists therefor, the government's burden will be met. *Id.*

■ In furtherance of the obligation imposed by § 2518(1)(c), the affidavit provided by the four Wilmington police officers states: (1) that the unidentified confidential informant was unwilling to testify in court against Swan or any persons involved in his organization for fear of reprisal; (2) that the informant would be unable to introduce an undercover police officer into the organization; (3) that all normal investigative techniques previously attempted had not succeeded, and appeared unlikely to succeed, in establishing gambling and conspiracy violations against Swan and his confederates; (4) that the purported illegal gambling operation being conducted by Swan and other individuals was a tightly knit conspiracy, which had been, and would continue to be, impregnable to investigative efforts because the violations occurred over the telephone and could not be objectively detected, and (5) that surveillance in the area of 2132 North Market Street would not produce sufficient evidence to establish the scope of the illegal gambling enterprise.

Read together with the detailed account of investigative activities contained in other sections of the affidavit, these five factors adequately illustrate the necessity for the wiretap. The toll call records, the information gleaned from other investigative agencies, the intermittent surveillance of the laundromat, and the information supplied by the confidential informant all had failed to establish the exact scope of Swan's illegal bookmaking activities. In addition, the informant was of limited utility because of his refusal to testify at trial, attempts to gain information through additional local informants were unavailing, any endeavor to plant an undercover agent in the midst of the bookmaking operation was considered too impractical and might have placed the informant in jeopardy, and efforts by the police officers to place gambling bets over the telephone facilities used in the alleged bookmaking operation proved unsuccessful. The only other normal investigative technique which might have been utilized, moreover, an authorized search both of the laundromat and of Igo's dwelling, would likely have produced only a portion of the necessary information. *See United States v. Vento, supra*, 533 F.2d at 850. Although such a search might have solidified the government's case against Swan and Igo, it would not, in all likelihood, have produced evidence sufficient to identify all the members of the illegal gambling conspiracy, who allegedly were located in

several different states. Such information could only be fully discovered through electronic surveillance of the targeted telephone facilities. In addition, a search of the laundromat and house would surely have forced the undiscovered conspirators to cease their operations for a period of time, and to relocate to another site, thus further hampering efforts to root out the entire gambling network.

On circumstances not unlike those presented here, several courts of appeals, including the Court of Appeals for the Third Circuit, have found sufficient necessity for a wiretap order, within the parameters of § 2518. *See e.g., United States v. Martino*, 664 F.2d 860, 868 (2d Cir. 1981); *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir.), *cert. denied sub nom. Abiledinger v. United States*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981); *United States v. Clements*, 588 F.2d 1030, 1036 (5th Cir. 1979); *United States v. Diadone*, 558 F.2d 775, 777 (5th Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Vento, supra*, 533 F.2d at 850; *United States v. Armocida, supra*, 515 F.2d at 38. The Court concludes that the affidavit in this case likewise comports with the requirements of § 2518(1)(c) and that Judge Walsh was fully justified in finding adequate need for the electronic surveillance.

## C. *Hours of Interception*

As their final challenge to the validity of the wiretap orders, defendants argue that the affidavit is defective because it failed to present facts sufficient to justify the daily period of surveillance authorized by Judge Walsh. The Wilmington police officers in this case applied for, and received, authorization to monitor the targeted telephone facilities for a period of 15 days, from 9:00 a. m. to 10:00 p. m. each day. Defendants do not challenge the number of days for which surveillance was authorized. Nor do they claim that the Wilmington police failed to minimize properly the interception of non-pertinent conversations, as required by § 2518(5). Instead, defendants contend

simply that the affidavit did not adequately support electronic monitoring during the limited interval from 9:00 a. m. to 11:00 a. m., and, for this reason, all evidence obtained from the wiretap must be suppressed.

Under Title III, a wiretap order must specify the number of days during which interception may be maintained; this period ordinarily may not exceed 30 days. 18 U.S.C. § 2518(4)(e) and (5). There is no express requirement, however, that the hours of interception be specified in the order. Nor have defendants cited the Court to any authority, either statutory or jurisprudential, which requires enforcement officers to designate an hourly time frame in the wiretap application and then to demonstrate a probable cause predicate for each and every hour for which surveillance is sought.

Nonetheless, whether such a burden exists or not is of no consequence to the facts of this case because the affidavit amply justified the daily surveillance authorized by Judge Walsh. Through the toll call analysis, the police had ascertained that the predominate volume of incoming and outgoing calls were made from the targeted telephone facilities between the hours of 9:00 a. m. and 10:00 p. m. The toll calls listed in the affidavit specifically establish, moreover, that during the six months preceding the issuance of the wiretap orders, certain calls were in fact placed between the morning hours of 9:00 a. m. and 11:00 a. m. from the telephone facilities subscribed to Swan. This fact indicates at the very least that persons were most likely on the premises at 2132 Market Street during the disputed time interval, and that telephone calls relating possibly to gambling activities occurred at that time. In addition, on January 9, 1981, seven days before the wiretap order was sought, police observed an unidentified white male drive up to the laundromat shortly before 11:00 a. m., remove a large box from the back seat of Swan's vehicle and enter the premises. Finally, in the expert judgment of the police officers drafting the affidavit, a period of surveillance from 9:00 a. m. to 10:00 p. m. was

deemed reasonably necessary to uncover the identities and modes of operation of all individuals involved in the illegal sports betting syndicate. These facts were sufficient to support electronic surveillance for the hours designated in Judge Walsh's order.

Having rejected defendants' final claim of defect in the wiretap application, the Court concludes that the first wiretap order issued by Judge Walsh is valid in all material respects. Further, because no additional grounds have been presented for impugning the validity of the two succeeding wire interception orders, beyond the contention that they were "fruits of the poisonous tree," these orders, and the evidence derived therefrom, likewise comport with federal law. Defendants' motion to suppress all evidence obtained from the electronic surveillance in this case, accordingly, will be denied.

## III. *Discovery*

Defendant Swan has moved for discovery of three categories of information: (1) a list of witnesses who appeared before the grand jury that indicted the defendants in this case, and the minutes of all grand jury proceedings; (2) the identity of the confidential informant named in the applications submitted in support of the electronic surveillance; and (3) the identity of any informants who the government attempted to enlist in this investigation. The United States has responded to this last request by stating that it is unaware of any informants who were approached by the government to assist in the investigation of the defendants. The United States has refused to respond, however, to the other two items of discovery sought by Swan.

▮ Under Rule 6(e), F.R.Cr.P., discovery may be permitted of grand jury proceedings only "upon a showing that grounds may exist for a motion to dismiss the indictment." F.R.Cr.P. 6(e)(3). Such disclosure has never been allowed without some assertion of demonstrable need for the materials which outweighs the important interest in preserving their confidentiality.

*See e.g., Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 223, 99 S.Ct. 1667, 1675, 60 L.Ed.2d 156 (1979); *United States v. Procter & Gamble*, 356 U.S. 677, 681, 78 S.Ct. 983, 985, 2 L.Ed.2d 1077 (1958). In this case, no reasons whatsoever have been advanced to support what would be a substantial intrusion into the secrecy of the proceedings which gave rise to the instant indictment. Accordingly, this portion of Swan's discovery request will be denied.

Swan's efforts to obtain the disclosure of the informant's identity fare no better. As the Supreme Court recognized in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the government possesses a qualified privilege to refuse to disclose the identity of a confidential informant from whom it received evidence of alleged criminal activity. Although this privilege may be overcome upon a proper showing of need, mere speculation as to the likely usefulness of disclosure has never sufficed to outweigh the government's interest in anonymity. *United States v. Estrella*, 567 F.2d 1151, 1153 (1st Cir. 1977); *United States v. Scott*, 555 F.2d 522, 529 (5th Cir.), *cert. denied*, 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977). "The defendant must indicate some concrete circumstances that might justify overcoming both the public interest in encouraging the flow of information [concerning criminal enterprises] and the informant's private interest in his own safety." *United States v. Estrella, supra*, 567 F.2d at 1153. (Citation omitted.) Moreover, where an informant's role was to supply probable cause for a search warrant and discovery of his true identity is sought solely to undermine the validity of that warrant, disclosure has not been required. *See McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *United States v. Bazzano*, (Cr.A. No. 81–1936) (3d Cir. July 7, 1982) slip op. at 20.

▮ Swan's avowed purpose in seeking identification of the confidential informant is to gather information to dispute the validity of the wiretap order. This justification is not adequate to meet the burden imposed by *Roviaro*. Accordingly, this discovery request likewise must be denied.

# 812

An order will be entered in accordance with this memorandum opinion.